ORR FELT COMPANY, APPELLANT, *v.* CITY OF PIQUA, APPELLEE.

[Cite as Orr Felt Co. *v.* Piqua (1983), 2 Ohio St. 3d 166.]

(No. 81-1824—Decided January 5, 1983.)

---

[1] Section 4, Article XVIII of the Ohio Constitution provides:

"Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service. The acquisition of any such public utility may be by condemnation or otherwise, and a municipality may acquire thereby the use of, or full title to, the property and franchise of any company or person supplying to the municipality or its inhabitants the service or product of any such utility."

[2] The fuel adjustment clause adopted by Ordinance No. 21-63 provided:

"When the weighted average cost per one million BTU of fuel consumed in the City's generating station during the calendar month immediately preceding the start of the billing month covered by the service bill decreases below 20.00¢ per one million BTU or increases above 26.00¢ per one million BTU, there shall be a decrease or increase in the energy charges of .0110¢ per kilowatt-hour for each change in the cost of 1¢ per one million BTU, and proportionately for each fraction thereof.

"The weighted average cost of fuel, as used above, shall be defined as the sum of (1) the cost, including freight, taxes, demurrage, unloading and analysis of fuel on hand at the first of each month, plus the cost of fuel received during the month, divided by the total amount of fuel on hand and received, and (2) when coal is consumed, the handling costs of such fuels into the bunkers of said plant and when oil or gas is consumed, the handling costs of such fuels at the burners of said plant during said month, said handling costs to be converted to cost per one million BTU of fuel consumed."

Although basic electric rates were amended by subsequent ordinances, the fuel adjustment clause remained the same as set forth in Ordinance No. 21-63 repealed on June 21, 1971, by Ordinance No. 24-71, which provided the following fuel adjustment clause:

"The energy charge for all kilowatt hours billed will be increased or decreased by the amount the average fuel cost per kilowatt hour sold increased or decreased as compared to the base period, the year 1969. Fuel adjustment will be calculated on calendar quarterly averages. The calculated adjustment will be applied to three months billings beginning with the first bill rendered one month after the end of the quarter (i.e., bills rendered May, June and July will use the calculated adjustment based on January, February and March experience).

"Fuel adjustment shall be determined by using the difference between the actual cost of fuel for the quarter and the calculated cost of fuel to supply the quarter's requirements using the base figures for the year 1969 of 16,438 BTU per net kilowatt generated and 30.790¢ per million BTU. The difference between the actual cost and the calculated cost divided by the kilowatt hours sold shall be the fuel adjustment factor.

"All bills rendered from the effective date of this ordinance until the first bill rendered in August 1971 shall have a calculated fuel adjustment applied using the average costs for the months of January, February and March 1971.

"Fuel costs, as used above, shall be defined as the delivered cost of such fuels, including freight, demurrage, taxes, unloading, analysis and handling costs of fuel consumed."

A new fuel adjustment clause was passed January 21, 1974, Ordinance No. 5-74, which deleted the third paragraph and amended the first paragraph to read:

"The energy charge for all kilowatt hours billed will be decreased by the amount the average fuel cost per kilowatt hour sold increased or decreased as compared to the base period, the year 1969. Fuel adjustment will be calculated on calendar monthly averages. The calculated adjustment will be applied to the bills rendered one month after the end of the base period month and every month thereafter."

On July 1, 1974, by Ordinance No. 28-74, appellee repealed the fuel adjustment clause and enacted an "Energy Acquisition Adjustment Clause," which provided:

"The energy charge for all kilowatt hours billed will be increased or decreased by the amount the average cost per kilowatt hour sold increased or decreased as compared to the base period, the year 1973. Energy adjustment will be calculated on calendar monthly averages. The

168

calculated adjustment will be applied to the bills rendered one month after the end of the base period and every month thereafter.

"Energy adjustment shall be determined by using the difference between the actual cost of acquisition for the month and the calculated cost to supply the month's requirements using the base figures for the year 1973 of 15,482 BTU per net kilowatt generated and 50.3623¢ per million BTU. The difference between the actual cost and the calculated cost divided by the kilowatt hours sold shall be the fuel adjustment factor.

"Acquisition costs, as used above, shall be defined as the delivered cost of fuels, including freight, demurrage, taxes, unloading, analysis and handling costs of fuel consumed, and as the cost at the Power Plant of any purchased energy."

The preceding energy acquisition adjustment clause was repealed on June 16, 1975, by Ordinance No. 21-75, and the following was enacted:

"The energy charge for all kilowatt hours billed will be increased or decreased by the amount the average cost per kilowatt hour sold increased or decreased as compared to the base period, January through October, 1974. The base period cost per kilowatt hour sold equals $0.0155200 per KWH.

"Energy adjustment shall be determined by using the differences between the actual cost of acquisition for the month and the calculated cost to supply the month's requirements using the

base figures in accordance with FPC Docket #R-479, wherein $F_m/S_m$ minus $F_b/S_b$ is equal to the calculated adjustment.

"The factors as used above are defined as:

"F = the cost of fossil fuel consumed including freight, demurrage, and taxes plus identifiable fuel costs associated with purchase power less energy sales.

"S = kilowatt hours generated plus purchases plus interchanges less total system losses.

"m = current period and b = base period."

[3] The portion of the judgment relating to steam overcharges was not appealed to this court.

Pratt, Freed & Virzi Co., L.P.A., and *Mr. Frederick D. Freed,* for appellant.

*Mr. Irving I. Saul, Messrs. Spiegel & McDiarmid, Mr. Thomas N. McHugh, Jr., Schwarzwald, Robiner, Wolf & Rock Co., L.P.A.,* and *Mr. Donald M. Robiner,* for appellee.

Bell & Randazzo Co., L.P.A., and *Mr. John W. Bentine,* urging affirmance, for *amicus curiae* Ohio Municipal Electric Association.

*Per Curiam.* The issue presented in this case is whether appellant class is entitled to a refund by appellee of alleged overcharges in electric rates. Appellant's argument is essentially twofold. First, it asserts that appellee set base rates which were too low to recover the costs of operation of the municipal power facility, ostensibly to impress local voters with the economy of their administration, and then billed for fuel adjustment charges which were excessive in order to recover costs. The fuel adjustment figures were, appellant argues, arbitrarily selected by appellee without relation to the ordinance then in force and were excessive. Second, appellant contends that appellee improperly passed through the fuel adjustment factor of Ordinance No. 21-75 costs associated with the purchase of power from Dayton Power & Light Co., which also resulted in excessive fuel adjustment factor charges. For the following reasons, we reject the arguments of appellant and affirm the judgment of the court of appeals.

Appellee is a chartered municipal corporation of the state of Ohio. Pursuant to the self-executing provisions of Section 4, Article XVIII of the Ohio Constitution, municipal corporations are authorized to establish, maintain and operate municipal lighting, power, and heating plants, for the generation, transmission and supplying of electricity to the municipal corporation and its inhabitants. "[T]he General Assembly is without authority to impose restrictions or limitations upon that power." *Swank* v. *Shiloh* (1957), 166 Ohio St. 415 [2 O.O.2d 401], paragraph one of the syllabus. See, also, *State, ex rel. McCann,* v. *Defiance* (1958), 167 Ohio St. 313 [4 O.O.2d 369], paragraph one of the syllabus; *Euclid* v. *Camp Wise Assn.* (1921), 102 Ohio St. 207, paragraph one of the syllabus; and *Bd. of Edn. of Columbus* v. *Columbus* (1928), 118 Ohio St. 295, paragraph three of the syllabus.

When a municipal corporation chooses to operate a public utility pursuant to a constitutional grant of authority, it functions in a proprietary capacity and is entitled to a "reasonable profit." *Niles* v. *Union Ice Corp.* (1938), 133 Ohio St. 169, 181 [10 O.O. 239]. The only restraint imposed by law upon a municipality's proprietary undertaking of providing electrical energy

is "that the rates charged be reasonable and that there be no unjust discrimination among the customers served, taking into account their situation and classification." *State, ex rel. Mt. Sinai Hospital,* v. *Hickey* (1940), 137 Ohio St. 474, 477 [19 O.O. 159].

Given these well-established principles, we decline to discover, as did the trial court, a common law of municipal utility rate making. In particular, we find no Ohio authority to support the proposition that a municipality must conform to a symmetry between the components of base rates and adjustment clauses. Rate making is, as the court of appeals pointed out in its well-reasoned opinion, an inexact science. The critical focus in an examination of the reasonableness of a rate ordinance is the totality of the ordinance, not isolated factors such as a fuel adjustment clause, which clause a municipality is not required to adopt.

In the instant case, the record does not reveal sufficient evidence to indicate that appellant class has carried its burden of demonstrating that the aggregate revenues collected under the base rates and adjustment clauses exceeded that permitted by both the base rate and the fuel ordinances. This is especially so with regard to Ordinance No. 21-75, where the record revealed that appellee's energy purchases from Dayton Power & Light Co. cost $877,000 less than the cost appellee would have had to incur to have generated the energy itself. Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

W. BROWN, SWEENEY, LOCHER, HOLMES, C. BROWN and KRUPANSKY, JJ., concur.

CELEBREZZE, C.J., dissents.

CELEBREZZE, C.J., dissenting. The majority opinion states that the only restraint imposed upon a utility is that the rates charged be reasonable and nondiscriminatory. Does this imply that a municipal utility need not comply with the municipality's ordinances and that charges, beyond those set by ordinances, are permissible unless they are unreasonable or discriminatory? To the contrary, I believe that a utility is bound to comply with an ordinance which specifies allowable charges.

Appellee maintains that the ratepayer must prove that the aggregate revenues collected under the base rates and the adjustment clauses exceeded those permitted by both the base rates and the fuel ordinances. Appellee's position, adopted by the majority, unfairly places the burden of compliance on the customer. It forces the ratepayer to closely scrutinize each bill received and compare charges with those allowed by the city ordinances. Clearly this is an onerous burden because the average ratepayer does not have the time or expertise to analyze ordinances and check the application of the

prescribed formulas to his bill. Instead the burden properly should be on the utility to strictly follow the mandates of the ordinances.

The majority focuses on the aggregate revenues collected. This approach ignores the language of the city ordinance which provides that the fuel adjustment clause includes the "cost of fossil fuel consumed including freight, demurrage, and taxes *plus identifiable fuel costs* associated with purchase power * * *." (Emphasis added.) Based upon this ordinance, the trial court made the following finding of fact: "7. Ordinance No. 21-75 provides that only identifiable fuel costs associated with purchased power be included as a component in calculating the fuel adjustment factor. In violation of said ordinance, defendant included the entire cost of purchased power in calculating the fuel adjustment factor."

The majority seems to conclude that because the purchased power cost less than if the utility had generated it, the ratepayers cannot complain that the charges were illegal. The savings due to the purchase are irrelevant to the issue of proper charges. The ordinance specifies the allowable charges in purchased power and the utility is bound to comply, whether municipally owned or otherwise.

For the foregoing reasons, I respectfully dissent.