**STATE of Iowa, Iowa State Board of Regents, and the University of Iowa, Appellants,**

v.

**CITY OF IOWA CITY and Stephen J. Atkins, City Manager, Appellees.**

**No. 91–641.**

Supreme Court of Iowa.

Sept. 23, 1992.

Bonnie J. Campbell, Atty. Gen., and Gordon E. Allen, Deputy Atty. Gen., for appellants.

John W. Hayek of Hayek, Hayek, Holland & Brown, Iowa City, for appellees.

Considered by HARRIS, P.J., and CARTER, LAVORATO, NEUMAN, and SNELL, JJ.

LAVORATO, Justice.

In this municipal utility ratemaking case, we must decide whether a municipality's employment of a flat use rate for sewer treatment services is unreasonable, arbitrary, and unlawfully discriminatory. The city of Iowa City is the municipality whose rate is being challenged. The challengers are the State of Iowa, the Iowa State Board of Regents, and the University of Iowa. For convenience, we refer to the city of Iowa City as the city and to the three challengers collectively as the university. Because we agree with the district

court that the university failed to sustain its challenge, we affirm.

For almost fifty years (1935–1983), the city and the university successfully negotiated a series of contracts for sewage treatment services and the financing of capital improvements in the sewage treatment system. In the beginning the city and the university entered into a contract for joint construction of a sewage collection and disposal system. Under the contract the university paid $118,200 as its share of the construction costs. This represented forty percent of the total cost of the system.

The parties modified this initial contract in 1950 to include sewage treatment services for University Heights and Coralville. The contract was modified again in 1957.

The city and the university entered into a new contract in 1964. Under this contract, the university's share of a proposed sewage improvement was established at $577,-500. This new contract canceled all earlier ones and designated the university a "customer" of the system, which would pay a service fee based on a percentage of its water bill. The fee structure established was basically the same one used for all customers.

Two years later, the city and the university entered into a contract calling for certain improvements in the sanitary sewer system. The contract obligated the university to shoulder some of the costs for these improvements. As before, the university agreed to be treated as a customer and to pay the same sewer charges as other customers paid.

In 1977 the city and the university executed a contract entitled "Modification No. 1 to Contract for Joint Construction and Use of Sewer Facilities by City of Iowa City and State University of Iowa." This contract changed the university's sewer service fees from a percentage of established water rates to a flat rate for the quantity of water used. More specifically the contract provided:

> The city will charge and the university will pay the same rate for collection and treatment of sewage as the rate charged to any other customer for standard domestic sewage.

In short, the city established a uniform commodity-based rate that was to be applied to all customers, including the university.

The 1977 contract further provided that (1) it should end July 31, 1983, (2) either party could indicate its desire to renegotiate the contract upon 180 days written notice before the expiration date, and (3) the terms of the 1977 contract would continue until the parties agreed to a revised contract. During the life of this contract, the city unilaterally increased rates from time to time without any objection from the university. Neither party sought to renegotiate the 1977 contract at any time before July 31, 1983, its stated termination date.

By the early 1980s federal and state regulations regarding sewage treatment became increasingly stringent. The city knew it had to upgrade its sewage treatment system to comply with these regulations. So it hired consultants, appointed committees, and formulated plans to improve its system. Two university representatives were members of a committee which came up with a plan the city adopted. The plan called for (1) rehabilitating the existing plant to improve its operation, (2) a new plant downstream from the existing plant, and (3) adding new trunk lines outside the central portion of Iowa City to feed into the new plant. The projected cost for these improvements was estimated at $40 million.

Armed with this information the university began making overtures to the city in late 1985 to negotiate a new contract. The city made it clear that "rates were not negotiable."

In June 1986 the university formally sought to negotiate a new contract by letter to the city. Several days later the university again wrote the city, suggesting arbitration to aid their negotiations. A month later, in a third letter to the city, the university told the city what it wanted and why:

The assessment of sewer charges on the basis of a flat rate for all customers, including the university, was equitable during the last period of nearly nine years. However, applying that approach in the future with the impending major improvement program requiring dramatic rate increases to cover the capital cost of expanding the system would result in gross inequities.

Several weeks following this last letter, the city responded by passing an ordinance that sharply escalated and continued the flat use rate for service upon all its customers. Consequently, the university would experience a nearly four-fold increase in rates over a three-year period.

Hoping to negotiate a better rate, the university earmarked funds to cover the additional amounts stemming from the rate increase and put them in escrow. Successful negotiations, however, did not materialize. The city threatened to cut off service to the university if full payment was not made.

The university responded by suing the city, seeking declaratory, injunctive, and compensatory relief. During the first part of this skirmish, district court judge Lynne E. Brady found that the 1977 contract had expired. The judge refused to grant the university injunctive relief to prevent the city from shutting off its service and to allow the university to escrow earmarked funds to pay the rate increase. The judge concluded the university had an adequate remedy of law: compensatory relief if the rate increases were set aside.

District court judge Van D. Zimmer tried the balance of the case later, finding that the university had not established the rate increases were unreasonable, arbitrary, and unlawfully discriminatory. It is from this ruling that the university has appealed.

I. Before considering the merits of this appeal, we think it would be instructive to mention constitutional and statutory provisions that are relevant.

Iowa municipalities were granted home rule by constitutional amendment in 1968 which provides:

Municipal corporations are granted home rule power and authority, not inconsistent with the laws of the general assembly, to determine their local affairs and government, except that they shall not have power to levy any tax unless expressly authorized by the general assembly.

The rule or proposition of law that a municipal corporation possesses and can exercise only those powers granted in express words is not a part of the law of this state.

Iowa Const. art. III, § 38A.

This constitutional grant is implemented through Iowa Code section 364.1 (1985), which provides:

A city may, except as expressly limited by the constitution, and if not inconsistent with the laws of the general assembly, exercise any power and perform any function it deems appropriate to protect and preserve the rights, privileges, and property of the city or of its residents, and to preserve and improve the peace, safety, health, welfare, comfort, and convenience of its residents. This grant of home rule powers does not include the power to enact private or civil law governing civil relationships, except as incident to an exercise of an independent city power.

Iowa Code section 384.81 permits a city to construct and maintain a city utility system. Revenue for operating such a system is generated through section 384.84(1), which pertinently provides that

[t]he governing body of a city utility ... may establish, impose, adjust, and provide for the collection of rates to produce gross revenues at least sufficient to pay the expenses of operation and maintenance of the city utility ... and, when revenue bonds ... are issued and outstanding pursuant to this division, shall establish, impose, adjust, and provide for the collection of rates to produce gross revenues at least sufficient to pay the expenses of operation and maintenance of the city utility ... and to leave a balance of net revenues sufficient at all times to pay the principal and interest

... and a sufficient portion of net revenues must be pledged for that purpose. Rates must be established by ordinance of the council.

The governing body of a city utility is, of course, the city council. *See* Iowa Code § 364.2(1) (1985). So the authority to set rates for a city utility rests with the city council.

Although a comprehensive system of public utilities regulation is mandated by Iowa Code chapter 476, municipally owned utilities are specifically exempted from regulation under this chapter except in certain instances not relevant here. *See* Iowa Code § 476.1B (1987). Iowa Code section 388.6 sets out the only statutory limitation on a city's power to set utility rates: "A city utility ... may not provide use or service at a *discriminatory* rate, except to the city or its agencies, as provided in section 384.91." Iowa Code § 388.6 (emphasis added).

II. Iowa Code section 388.6 codifies only one common law limitation on a city's power to set utility rates: that such rates not be discriminatory. Other common law limitations and rules also apply. They are succinctly stated by one noted treatise writer as follows:

The rates charged by a municipal utility must be fair, reasonable, just, uniform and nondiscriminatory, and the same rules in regard to the reasonableness of private utility companies apply.... Judicial review may usually be had as to the reasonableness of the rates, but the court may not engage in ratemaking since this is a legislative function.

Reasonable discretion must abide in the officers whose duty it is to fix rates. Their determination should not be disturbed if there is any reasonable basis for that determination, or unless it is proved that the rates are excessive and the action of the rate-fixing officers illegal and arbitrary. It will be presumed, in the absence of any showing to the contrary, that the municipality acted properly. A rate lawfully established is assumed to be reasonable in the absence of a showing to the contrary, or a show-ing of mismanagement, fraud, or bad faith, or that the rate is capricious, arbitrary, or unreasonable. Each case must be decided on its own facts. The burden of proof is on the party claiming unreasonableness or discrimination. A city has no duty to justify or explain its actions in setting rates until the party contesting their validity shows their invalidity by competent evidence.

12 Eugene McQuillin, *Municipal Corporations* § 35.37a, at 616–17 (3d ed. 1986) [hereinafter McQuillin]; *see also Knotts v. Nollen,* 206 Iowa 261, 262–63, 218 N.W. 563, 564 (1928) (relying on substantially the same principles in upholding rates for a municipally owned water plant against challenge of unlawful discrimination).

■ Under these rules once the city passed the ordinance, the new rates were presumed valid. The university had the burden to prove its claim that the rates were unreasonable, arbitrary, and unlawfully discriminatory. Until the university produced competent evidence to establish its claim, this presumption of validity continued.

■ The district court found that the university had not proven its claim. Had the court found otherwise, it could only have set the rates aside. It could not have established new rates because that is a legislative function residing solely in the city council.

■ On appeal our review is similarly limited to determining whether the university proved its claim that the rates are unreasonable, arbitrary, and unlawfully discriminatory. This determination is a mixed question of fact and law.

Given the nature of these proceedings, we review the fact part of this determination de novo. The law part of this determination, of course, is strictly within our domain. We are limited as the district court was. If we agree with the district court, the matter ends there. If we disagree, we—like the district court—can only set the rates aside.

III. With these principles in mind we turn to the record to determine whether the

rates here are unreasonable, arbitrary, and unlawfully discriminatory.

The university's argument is simple and straightforward: the city should put the university in a separate class with a lower rate because it costs the city significantly less to service the university than it costs to service other customers. The university believes the city's imposition of a flat rate on all customers based upon *use* of water is a simplistic "quick fix" that fails to recognize and fairly allocate the *cost* of service to all customers. Under the flat use rate, the university maintains it ends up subsidizing other private users. In other words, a flat rate based upon use unlawfully discriminates against the university, while a cost of service rate would not.

The university urges that the city's recognition of only one class—that of "user"—fails to account for alleged cost-reducing characteristics of the university, which the university claims entitle it to a cost-based rate system. Six reasons are offered supporting the university's uniqueness: (1) it is the single largest user of the system, (2) it is a "state institution of substantial magnitude," (3) it is a captive customer, with fixed boundaries, (4) it owns part of the system because of its past appropriation to the city from state funds, (5) it does not use all of the improvements to the system, and (6) the city spends fewer resources billing the university than it does billing other customers.

The city rebuts the cost of service approach by arguing that (1) cost of service studies are not accurate, (2) cost of service studies are expensive, (3) these studies require the use of outside experts and must be repeated periodically, and (4) the creation of classes would result in endless disputes among customers that would have to be resolved by the city.

We think the university's argument assumes three things: (1) the flat rate based on use approach is inherently discriminatory, (2) cost of service is the only factor a city may consider in fixing rates, and (3) the university proved that it costs the city significantly less to service the university than it costs to service any other customer.

For reasons that follow, we reject all three assumptions.

■ A. *Flat rate based on use.* A number of courts have upheld sewer use rates based on the amount of water used on the premises regardless of whether all of such water reaches the sewers. These cases are collected in Maurice T. Brunner, Annotation, *Validity and Construction of Regulation by Municipal Corporation Fixing Sewer–Use Rates*, 61 A.L.R.3d 1236, 1276–86 (1975).

One court stated the logical and reasonable connection between a city's water works and sewer system this way:

> The purpose of a city water system is to furnish pure health giving water to the inhabitants and users of water in a city. The purpose of a city sewer system is to collect such water after it has become contaminated and injurious to health and (with other unhealthful substances) remove them all from the various premises and dispose of it all in [a] sanitary manner.... A sewer system would be of no value without a water system and a water system would be entirely incomplete without a sewer system.

*City of Maryville v. Cushman*, 363 Mo. 87, 98, 249 S.W.2d 347, 352 (1952) (citations omitted).

This reasonable and logical connection between a waste water and sewer system has furnished the rationale for upholding a sewer charge based on amount of water used:

> There is a close relation between the amount of water used and the amount of sewerage carried away. There can be no doubt that a greater percentage of metered water goes into the sewer in winter than in summer, due largely to the watering of lawns during the summer months.... It would certainly be very expensive, if not an impossible undertaking, to measure the amount of sewerage discharged by each user. A sewer charge based upon the amount of water used certainly is not mathematically exact as to the actual amount of water used on given premises which goes into the sewer, but the fact that it is not

mathematically correct does not render such a rate unreasonable, arbitrary, or otherwise illegal.

*Bexar County v. City of San Antonio,* 352 S.W.2d 905, 909–10 (Tex.Civ.App.1961); *accord Sharp v. Hall,* 198 Okl. 678, 680, 181 P.2d 972, 975 (1947) ("In the absence of actually measuring the flow of sewage, [measuring sewer charges by the water delivered to the premises] seems to be the most equitable manner of determining the extent of use of the sewer system by the different users."); *In re City of Philadelphia,* 343 Pa. 47, 50, 21 A.2d 876, 878 (1941) ("[T]he amount of water which flows into a building is apt to be roughly proportional to what flows out as sewage. While there are exceptions without doubt, and while it might be more equitable to consider some further factors having to do with types of use, yet we cannot say that a measure of sewer use based upon water use is inequitable."); *Houchins v. City of Beckley,* 127 W.Va. 306, 309, 32 S.E.2d 286, 288 (1944) ("We believe that it is fair for a levying body to assume that the quantity of water supplied to a user within a municipality indicates the extent to which the city's sewage system is made use of, either directly or indirectly, by the property owners.").

We are persuaded by the rationale of these courts and reject any notion that the mere use of water consumption to establish sewer rates is inherently unreasonable, arbitrary, or unlawfully discriminatory.

■ B. *Cost of service as only factor.* The university cites no authority for the proposition that the cost of supplying municipal sewer services is the only factor that a city may consider in setting rates. Nor does the university cite any authority that the city must separate its utility customers into special classes and treat each differently. Courts that have addressed these two issues have rejected both notions. *See, e.g., Marshall Durbin & Co. v. Jasper Utilities Bd.,* 437 So.2d 1014, 1024 (Ala.1983) (rejecting argument that municipality must classify users for purposes of setting rates) (customer argued that city should have put it into separate class because it cost the city less to provide the customer sewer services than it did to provide such services to other users); *Shepherd v. City of Wentzville,* 645 S.W.2d 130, 133 (Mo.App.1982) ("Cost of service is but one consideration in the determination of the reasonableness of the rate."); *Oradell Village v. Township of Wayne,* 98 N.J.Super. 8, 11, 235 A.2d 905, 907 (1967) (cost of furnishing water need not be sole criterion to be considered in rate classification); *Fairway Manor, Inc. v. City of Akron,* 13 Ohio App.3d 233, 234, 468 N.E.2d 927, 930 (1983) ("[R]ate making is an inexact science. Several considerations beyond the actual dollar cost of providing service are permitted."); *City of Pittsburgh v. Pennsylvania Public Util. Comm'n,* 171 Pa.Super. 187, 215, 90 A.2d 607, 621 (1952) (rejecting argument that rate charged should be based on cost of supplying service only and that cost allocation studies should be made to determine this); *Caldwell v. City of Abilene,* 260 S.W.2d 712, 714 (Tex.Civ. App.1953) (rejecting cost as the only factor to be considered in setting rates); *City of West Allis v. Public Serv. Comm'n,* 42 Wis.2d 569, 576–80, 167 N.W.2d 401, 405–06 (1969) (in designing rate structure to recover revenue to which city water utility is entitled, city is not required to apply a cost-of-service formula to each class of customer or to each customer within a class) (rejecting argument that city has responsibility to make exacting cost study of supplying service to consumers and classes of consumers in determining rate increase).

Recognizing that ratemaking is an inexact science, courts have determined that several other considerations beyond the actual dollar cost of providing service are permitted. *See, e.g., Caldwell,* 260 S.W.2d at 714. The critical factor is the reasonableness of the rate ordinance as a whole. *Orr Felt Co. v. City of Piqua,* 2 Ohio St.3d 166, 170, 443 N.E.2d 521, 525 (1983) (per curiam).

Tracking Iowa Code section 384.81, the ordinance here provides:

The user charge system shall generate adequate annual revenues to pay:

(1) Costs of annual operation and maintenance, and

(2) Costs associated with sewer bond retirement for bonds now outstanding including payments to all sinking, revenue,

depreciation, extension and improvement funds established in the ordinances or resolutions authorizing such bonds, and (3) When required, costs associated with sewer bond retirement of bonds to be issued in the future.

We agree with the district court that the university has failed to prove the rates charged did not reasonably relate to these three factors in the ordinance just cited. As a whole, then, the ordinance is reasonable.

Our inquiry, however, does not end with a determination that the ordinance is reasonable as a whole. An ordinance that establishes a flat rate for sewer services based on water consumption could still be unreasonable, arbitrary, and unlawfully discriminatory as to individual members of a class. Several courts have found that sewer service rates based on water consumption were unreasonable as to individual ratepayers. In one case, only fifteen percent of the water furnished the customer reached the city's sewer system. *Concord Steam Corp. v. City of Concord*, 128 N.H. 724, 725–29, 519 A.2d 266, 268–70 (1986). In another case, only five percent of the water furnished the customer reached the city's sewer system. *Borough of North East v. A Piece of Land*, 191 Pa.Super. 532, 534–36, 159 A.2d 528, 530 (1960). Yet in both cases the customer was charged the same rate as all other users.

In *Concord Steam Corp.*, the court found that, because of the disparity, it was unreasonable for the city to calculate the customer's sewer charges based on water consumption. *Concord Steam Corp.*, 128 N.H. at 728–29, 519 A.2d at 270. Similarly, in *Borough of North East*, the court found that the city's method of computing the sewer charge based upon total water consumption regardless of its use was an "arbitrary, improper, inequitable, and unlawful charge." *Borough of North East*, 191 Pa.Super. at 538–39, 159 A.2d at 531. *See also Dennis v. United States*, 339 U.S. 162, 184, 70 S.Ct. 519, 526, 94 L.Ed. 734, 749 (1950) (Frankfurter, J., dissenting) ("It was a wise man who said that there is no greater inequality than the equal treatment of unequals."); *Jager v. State*, 537 P.2d 1100, 1109–10 (Alaska 1975).

As we said, the cost of supplying municipal sewer service is not the only factor a city may consider in fixing sewer rates. But when such cost is grossly out of proportion to the burden placed on the sewer system by a customer, the rate as to that customer may be unreasonable, arbitrary, and unlawfully discriminatory. In those circumstances, the customer is subsidizing other users of the system. These are the lessons to be learned from *Concord Steam Corp.* and *Borough of North East*.

That brings us to the final inquiry: whether the university proved that it costs the city significantly less to service the university than it costs to service other customers.

■ C. *Cost of services furnished.* In our de novo review, we agree with the district court that the university failed in its burden of proof regarding this issue. As the district court pointed out, both sides rely heavily on two experts whose testimony is diametrically opposed. We agree with the district court's assessment of the evidence and adopt it as our findings:

> Essentially, the evidence in this case consists of the testimony and reports of two well-regarded [experts]. Unfortunately, their conclusions are so different that it is difficult not to be cynical concerning the conclusions reached. Despite the expenditure of substantial tax dollars and time by both parties to analyze and measure cost of service, this court cannot say with any degree of assurance what the cost of service is to the university. The evidence makes abundantly clear that cost of service studies when dealing with a waste water treatment plant are at best difficult. Indeed, $10,000 of the city's money was spent by their [expert] attempting to gather actual sewage flow data without substantial success. In addition, [experts on both sides] testified that they would regard a plus or minus 20 percent degree of accuracy as doing well with the type of study undertaken. One [expert] described the reliability of cost of service studies in a waste water treatment setting as one or two on a scale of 100. Further, the [experts] have significant differences as to how I and I

(infiltration and inflow) should be assessed and approached in connection with the analysis of cost of service in this case. It is apparent from the record that even the total inflow into the sewer plant is not really known. The court also concludes that neither party has established the strength of waste water coming into the system from the various users of the system with any degree of certainty. The university's [experts'] assumptions about strengths were based on twelve-year-old data. The court concludes that the data necessary to do an accurate cost of service study is not currently available.

IV. In sum, we conclude the university has failed to prove that the city's employment of a flat use rate for sewer treatment service is unreasonable, arbitrary, and unlawfully discriminatory as to it. For this reason, we affirm.

Although we have not addressed all of the contentions and arguments in this appeal, we have considered them. We have addressed only those we find necessary to dispose of this appeal.

AFFIRMED.