[Cite as *Yoby v. Cleveland*, 2020-Ohio-3366.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| CLINT YOBY, ET AL., | : | |
| Plaintiffs-Appellants, | : | |
| | | No. 108174 |
| v. | : | |
| CITY OF CLEVELAND, | : | |
| Defendant-Appellee. | : | |

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; REVERSED IN PART; AND REMANDED
**RELEASED AND JOURNALIZED:** June 18, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-15-852708

---

## *Appearances:*

Landscroner, Grieco, Merriman, L.L.C., and Jack Landscroner; Merriman, Legando, Williams & Klang, L.L.C., Drew Legando, Thomas Merriman, and Edward Jerse; Bashein & Bashein Co., L.P.A., W. Craig Bashein, and John Hurst; Scott & Scott, L.L.P., and Geoffrey M. Johnson; Meyers, Roman, Friedberg & Lewis, Peter Turner, Carolyn Blake, and Debra Horn, *for appellants*.

Calfee, Halter & Griswold, L.L.P., Richard P. Goddard, N. Trevor Alexander, and Abbey Kinson Brown, *for appellee*.

KATHLEEN ANN KEOUGH, J.:

{¶ 1} This case arises from a class action lawsuit filed by plaintiffs-appellants, Clint Yoby, Tremont Scoops L.L.C., 2362 Professor Avenue L.L.C., and Tymex Plastics, Inc., (collectively "appellants") against defendant-appellee the city of Cleveland ("the city") where the central issue is whether the city was authorized under the law to assess certain adjustments on customers' electric bills. The parties stipulated to class certification, defining the class as "all Cleveland Public Power customers who paid bills that included an 'Energy Adjustment Charge' during a time when Cleveland Public Power was making an Environmental Adjustment in the billed Energy Adjustment Charge." Appellants appeal from the trial court's decision granting summary judgment in favor of the city on appellants' causes of action for breach of contract, fraud, declaratory judgment, injunction, and unjust enrichment. For the reasons that follow, we affirm in part; reverse in part; and remand for further proceedings.

## I. Background

{¶ 2} The city is a municipal corporation and political subdivision under R.C. 2744.01(F).[1] The city's municipally owned utility Cleveland Public Power ("CPP") sells electric power to customers in Cleveland, including residential, commercial, and industrial customers such as the appellants in this case.

---

[1]The city's operation of Cleveland Public Power is a "proprietary function" as defined under the Political Subdivision Tort Liability Act. R.C. 2744.01(G)(2)(c) and 2744.02(B)(2).

{¶ 3} In the 1970s, CPP generated electric power and distributed it to its customers. In 1974, Cleveland City Council passed Ordinance No. 1629-73 that amended and renamed then Section 1.2518 — "Environmental and Ecological Adjustment." This section allowed the city through CPP to recover certain identified costs incurred in the operation of the utility without need for further city council action or approval. The two-paragraph section was renumbered in 1976 during the recodification to current Cleveland Codified Ordinances ("C.C.O.") 523.17, but the heading stayed constant — "Environmental and Ecological Adjustment." During the recodification, identifiers (a) and (b) were added to the beginning of each of the respective paragraphs of the section, purportedly designating the paragraphs as subsections.

{¶ 4} Ordinance No. 1629-73 also amended and renamed Section 1.2522 — "Excess Fuel and Power Production Charge." This section allowed for the assessment to the rate schedules an additional incremental charge or credit for excess fuel or power production costs. The section was amended, renamed, and renumbered during the recodification to current C.C.O. 523.21 — "Energy Adjustment Charge." The purpose of the section remained, but the language was expanded to offer more guidance and structure.

{¶ 5} By 1977, CPP essentially ceased generating power and became an electricity reseller. The parties admit that between 1974 and 1984, CPP did not assess any costs that would qualify for recoupment under the Environmental and Ecological Adjustment (hereinafter "EEA").

{¶ 6} In 1984, CPP began levying adjustments to customers' electric bills under the authority of an EEA. It is stipulated that between 1984 and 2013, CPP generated $188 million in revenue by making these adjustments.[2] When these adjustments were assessed, the charges were not separately delineated or identified on the bills. Instead, the amounts were combined with the other city council-approved adjustment — the Energy Adjustment Charge (hereinafter "EAC"). Accordingly, customer bills would list the base-rate charges and an additional "Energy Adjustment Charge," which would include adjustments under both the EAC and EEA.

{¶ 7} Appellants brought suit against the city contending (1) that CPP was not authorized to adjust customer bills pursuant to C.C.O. 523.17 to recover the EEA costs incurred because those costs were not authorized under the ordinance; and (2) CPP was required to separately identify on customer bills the amounts assessed for an EEA, instead of embedding them into a single line item identified as "Energy Adjustment Charge." According to appellants, the city's actions constituted a breach of contract and fraud.

{¶ 8} Both parties moved for summary judgment. The city sought full and complete summary judgment on all claims, and appellants sought partial summary judgment on their breach of contract cause of action. The trial court granted the

---

[2] The city contends that there remains a balance of over $418 million in costs for the purchase and installation of power supply apparatus for which the city has not yet billed its customers.

city's motion for summary judgment, denied appellants' motion for partial summary judgment, and entered judgment in favor of the city on all claims of the complaint.

{¶ 9} Appellants now appeal raising two assignments of error. [3]

## II. Summary Judgment

{¶ 10} In their first assignment of error, appellants contend that the trial court erred in entering summary judgment in favor of the city. Specifically, the issue raised is whether the trial court erred in interpreting the ordinances so as to allow the city to recover costs by way of environmental and ecological adjustments that were not costs associated with protecting the environment.

{¶ 11} We review a trial court's decision on a motion for summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Summary judgment is appropriate when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can only reach a conclusion that is adverse to the nonmoving party. *Zivich v. Mentor Soccer Club*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 210 (1998).

{¶ 12} The party moving for summary judgment bears the burden of demonstrating that no material issues of fact exist for trial. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). The moving party has the initial responsibility of informing the trial court of the basis for the motion and identifying

---

[3] Appellants do not appeal the denial of their partial motion for summary judgment.

those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claims. *Id.* After the moving party has satisfied this initial burden, the nonmoving party has a reciprocal duty to set forth specific facts by the means listed in Civ.R. 56(C) showing that there is a genuine issue of material fact. *Id.*

## A. Breach of Contract

{¶ 13} C.C.O. Chapter 523 governs the rules and rates for electricity sales to customers. The parties agree that a binding contract exists between the city and appellants pursuant to the "Electrical Service Agreement" found in C.C.O. 523.19(b) (hereinafter "the agreement"). Within this agreement, customers are charged monthly for receipt of electrical services. Article 3 of the agreement specifically provides:

> For the electric service furnished under this contract, the Customer agrees to pay the City in accordance with the terms, conditions and applicable rate schedule established by or as may be amended from time to time by the City and approved by City Council, and said rates, terms and conditions are hereby made a part of this contract the same as if incorporated herein.

Accordingly, the agreement is imposed by law, and includes the statutory provisions for CPP's billing and cost recovery mechanisms.

{¶ 14} Appellants allege that the city breached the agreement by violating the statutory provisions for billing and cost-recovery by (1) charging an EEA that was not authorized by C.C.O. 523.17; (2) charging an EEA amount on customer billings

as an undisclosed part of the EAC; and (3) by failing to prorate the EEA on a cents per kilowatt-hour basis equally across all rate schedules.

{¶ 15} Appellants first allege that the city charged amounts identified as an EEA to recover costs that were not environmental and ecological costs as specifically defined and required under C.C.O. 523.17.

{¶ 16} The issue in this case centers on the interpretation of C.C.O. 523.17, titled "Environmental and Ecological Adjustment." This section provides:

> (a) The costs of special apparatus and equipment required for compliance with Federal, State or City environmental protection laws and directives as have been or may be installed and operated from time to time or on a continuing basis shall be prorated on a ¢/KW.-hr. basis and assessed against the appropriate rate schedule. The provisions of this section may be applied to rate schedules described in Sections 523.02 to 523.06 or any other rate schedules as may later be enacted and approved.

> (b) The costs for which an adjustment can be incurred shall include but are not limited to voluntary or involuntary research and development charges, purchase and installation of emission control equipment for sulphur, nitrogen and particulate emissions, purchase and installation of control equipment for protection of the natural water supply, purchase and installation of power supply apparatus and power from remote resources and any other charges levied on the Division of Light and Power in lieu of precise compliance with statutes and directives.

{¶ 17} Appellants maintain that adjustments can only be made to recover actual costs of environmental protection measures, whereas the city contends that the adjustments may be made for any other purpose, including those specifically listed in paragraph (b), which do not have to specifically relate to "actual costs of environmental protection measures." In sum, the city argues that *any cost* could justify an EEA without regard to the description of costs in C.C.O. 523.17(a), such

that the recoverable costs are not limited only to environmental or ecological purposes. Appellants counter that the costs identified in paragraph (b) describe the recoverable costs in paragraph (a) and are not independent costs as the city maintains, but merely examples of what costs may be recovered.

{¶ 18} In this case, the trial court found that the ordinance language was not ambiguous and thus, it is to be enforced as written. The court rejected appellants' interpretation of C.C.O. 523.17, finding that "no language in the ordinance supports" their contention that the EEA amounts are solely for "costs of special apparatus and equipment required for compliance with environmental protection laws and directives." Specifically, the court stated:

> the ordinance clearly permits adjustments beyond those required for environmental protection compliance. CCO 523.17(b) allows recovery of costs that are not described in [paragraph (a)]. For example, CCO 523.17(b) allows for adjustments which are not "special apparatus and equipment" or which are not environmentally related.

{¶ 19} Therefore, the first issue that must be determined is whether C.C.O. 523.17 only allows for the recovery of "costs of special apparatus and equipment required for compliance with environmental protection measures." Simply put, what costs can be deemed "costs" under C.C.O. 523.17, and thus can be used as the basis for adjustments on a customer's electric bill? Accordingly, whether the city failed to comply with Chapter 523 in its use of an EEA turns on the interpretation of those legislative provisions, which is a matter of law reviewed de novo. *State v. Pariag*, 137 Ohio St.3d 81, 2013-Ohio-4010, 998 N.E.2d 401, ¶ 9.

{¶ 20} The same rules apply when reviewing an ordinance as when reviewing a statute. The primary goal of statutory construction is to give effect to the legislature's intent. *Ayers v. Cleveland*, Slip Opinion No. 2020-Ohio-1047, ¶ 17. To determine the intent of the legislature, we first look to the plain language of the statute. *State ex rel. Burrows v. Indus. Comm.*, 78 Ohio St.3d 78, 81, 676 N.E.2d 519 (1997).

{¶ 21} If the plain language of the ordinance conveys a clear, unequivocal and definite meaning, we apply the language as stated without interpretation or construction. *See, e.g., Georgetown of the Highlands v. City of Cleveland Div. of Water*, 2016-Ohio-8039, 75 N.E.3d 794, ¶ 21 (8th Dist.), citing *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.*, 74 Ohio St.3d 543, 545, 660 N.E.2d 463 (1996); *Cleveland v. Elkins*, 8th Dist. Cuyahoga No. 91378, 2008-Ohio-6288, ¶ 19. If, however, an ordinance is ambiguous, i.e., if the language of the ordinance is susceptible to more than one reasonable interpretation, we must apply rules of construction to interpret the ordinance. *See, e.g., Georgetown of the Highlands* at ¶ 21; *Columbus v. Reiner*, 2018-Ohio-975, 108 N.E.3d 719, ¶ 33 (10th Dist.).

{¶ 22} In this case, the parties agree that C.C.O. 523.17 is unambiguous, and each contends that the plain language of the ordinance favors their respective interpretations. The fact that the parties find different meanings to the ordinance, supported by good arguments, is a reasonable basis for this court to find that C.C.O. 523.17 is ambiguous. *See Turner v. Hooks*, 152 Ohio St.3d 559, 2018-Ohio-556, 99 N.E.3d 354, ¶ 12, quoting *4522 Kenny Rd., L.L.C. v. Columbus Bd. Of Zoning*

*Adjustment*, 152 Ohio App.3d 526, 2003-Ohio-1891, 789 N.E.2d 246, ¶ 13 (10th Dist.). ("A statute is ambiguous 'if a reasonable person can find different meanings in the ordinance and if good arguments can be made for either two contrary positions.'")

{¶ 23} Nevertheless, whether we view C.C.O. 523.17 as ambiguous or unambiguous, this court would reach the same result — that C.C.O. 523.17 requires that adjustments made to customer bills must correlate to those costs incurred "for compliance with Federal, State or City environmental and protection laws." Accordingly, we agree with appellants.

## 1. Construction of C.C.O. 523.17 if Ambiguous

{¶ 24} "'Where a statute is found to be subject to various interpretations, however, a court called upon to interpret its provisions may invoke rules of statutory construction in order to arrive at the legislative intent.'" *Symmes Twp. Bd. of Trustees v. Smyth*, 87 Ohio St.3d 549, 553, 721 N.E.2d 1057 (2000), quoting *Meeks v. Papadopulos*, 62 Ohio St.2d 187, 190, 404 N.E.2d 159 (1980). The standard rules of construction are also applied to ordinances. *Gesler v. City of Worthington Income Tax Bd. of Appeals*, 138 Ohio St.3d 76, 2013-Ohio-4986, 3 N.E.3d 1177, ¶ 12. Pursuant to C.C.O. 101.03, "words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."

{¶ 25} Courts review several factors in order to glean the legislative body's intent when statutes or ordinances are considered ambiguous. And for Cleveland's municipal ordinances those factors include "(1) the object sought to be attained; (2) the circumstances under which the ordinance was enacted; (3) the legislative history; (4) the common law or former legislative provisions, including laws upon the same or similar subjects; (5) the consequences of a particular construction; and (6) the administrative construction of the ordinance." C.C.O. 101.07(c).

{¶ 26} Regarding the first two factors — the object sought to be attained and the circumstances under which the ordinance was enacted — appellants contend that in 1974 Cleveland city council enacted now C.C.O. 523.17 in response to regulations imposed by the newly created Environmental Protection Agency and the Ohio Environmental Protection Agency. Although the city challenges the justification for the enactment of C.C.O. 523.17, it does not offer or provide any alternative argument explaining why council enacted this law in 1974.

{¶ 27} It cannot go unnoticed, however, that in December 1970, in response to the infamous Cuyahoga River fire and other environmental disasters, Congress passed legislation that created the Environmental Protection Agency ("EPA"). And in 1972, the General Assembly enacted the Ohio Environmental Protection Agency. Additionally, Congress authorized the EPA, as part of the Clean Air Act of 1970, to set national air quality, auto emission, and anti-pollution standards, to reduce the presence of lead, sulfur oxides and other harmful air pollutants. *See generally* http://www.epa.gov/history.

{¶ 28} The creation of the EPA, the Ohio EPA, and the acts that followed, lends credence to appellants' contention that in 1973 Cleveland city council introduced and subsequently passed what is now C.C.O. 523.17 in response to these environmental changes and regulations. The heading of C.C.O. 523.17 and the language contained in the ordinance focus on environmental and ecological concerns and governance — "in compliance with Federal, State, and City environmental laws and directives."

{¶ 29} The third and fourth factors used to determine legislative intent are the legislative history of the ordinance and the common law or former legislative provisions.

{¶ 30} In 1974, city council enacted then Section 1.2518 (now C.C.O. 523.17) titled "Environmental and Ecological Adjustment." When the ordinance was enacted, it was a single code section comprised of two paragraphs. However, during the recodification of the city ordinances in 1976, the identifiers of (a) and (b) were added to the respective paragraphs, diving them into subsections. This legislative construction is important because it appears that the two paragraphs when created were not meant to be read independently as subsections, but rather as complementary paragraphs.

{¶ 31} The next factor for this court to consider is "the consequences of a particular construction." Construing C.C.O. 523.17 as appellants suggest would allow CPP to only assess adjustments to rate schedules that are costs associated with the purchase, installation, and operation of special apparatus and equipment that

are required for compliance with environmental protection laws and directives, or charges in lieu of precise compliance with laws and directives. This is a very narrow construction.

{¶ 32} On the other hand, construing the ordinance as the city suggests allows the city to assess an adjustment for any cost that CPP deems appropriate. This an extremely broad construction, which potentially renders other ordinances that authorize an adjustment to base rates or an additional charge, e.g., the EAC under C.C.O. 523.21, superfluous because under the city's interpretation, "any cost" could be justification for an adjustment under the nonexhaustive list provided by C.C.O. 523.17(b).

{¶ 33} The final factor to be considered is "the administrative construction of the ordinance." The evidence suggests that the city, prior to litigation, construed C.C.O. 523.17 to allow the city to adjust customer bills to assess an EEA for the purchase of power supply apparatus, but only for compliance with environmental laws. In a memorandum prepared prior to litigation in response to the CPP's questionable assessment of the EEA, then CPP Commissioner Ivan Henderson stated:

> CPP's historic view has been that it is able to recover for environmental impact and compliance expenditures in the following areas:
>
> • Research and development (voluntary and involuntary);
>
> • Purchase of emission control and equipment (for sulfur, nitrogen, and particulate emissions);
>
> • Installation of emission control equipment;

• Purchase of control equipment for protection of natural water supply;

*• Purchase of power supply apparatus and equipment for compliance with environmental laws;*

• Power from remote sources (unsure about the environmental compliance connection here and this is not one CPP has based its charges on); and

• Other charges levied on CPP in lieu of precise compliance with environmental statutes and directives.

(Emphasis added). *See* CPP Commissioner Ivan Henderson Deposition, July 13, 2016, exhibit No. 5.

{¶ 34} In fact, when first pressed about the EEA, Henderson provided a list of EEA recoverable costs, but did not specify that the costs were for "power supply apparatus." Instead, the list identified "car/truck parts" as "special apparatus and equipment," "labor costs" as "installation charges," and "landscaping/tree trimming" as "other charges in lieu of compliance." *See* Director of Department of Public Utilities, Paul Bender Deposition, April 20, 2017, exhibit No. 13. The position taken by the city after litigation is that assessed EEAs were only for general power supply apparatus that were not environmentally related.

{¶ 35} Although not listed as a factor, appellants maintain that the section heading of C.C.O. 523.17 "Environmental and Ecological Adjustment" supports their interpretation of the ordinance that the amounts assessed contemplates adjustments based on environmental and protection laws. The trial court rejected any consideration of this point, based on C.C.O. 1.01 and R.C. 1.01, which provide

that "section headings * * * do not constitute any part of the law as contained in the Codified Ordinances."

{¶ 36} Despite the trial court's conclusion, the Ohio Supreme Court has given some consideration to section headings when construing statutes but has rejected any attempt to use it to alter unambiguous language. *See State v. Kiser*, 13 Ohio St.2d 126, 128, 235 N.E.2d 126 (1968) (noting that "while not totally persuasive," a section title added credence to the court's construction of a statute); *State ex rel. Murphy v. Athens Cty. Bd. of Elections*, 138 Ohio St. 432, 435, 35 N.E.2d 574 (1941) (a heading or title given by a legislative body to a statute must be accorded consideration, as long as it is not employed to alter the meaning of language that is unambiguous.).

{¶ 37} The city maintains that the headings are not part of the law. We agree, but we find that the heading is relevant when construing the ordinance as a whole. The heading may aid in construction where a statute is ambiguous, and the section heading "Environmental and Ecological Adjustment" supports the appellants' contention that the adjustments are assessed for environmental and ecological purposes. Although it is not a determinative factor, the heading does have some weight on our conclusion that the appellants' interpretation of C.C.O. 523.17 is correct.

{¶ 38} Based on the factors listed, we construe that the legislature intended that C.C.O. 523.17 be utilized to recoup money by way of an adjustment on rate schedules when the city was required to purchase, install, or operate special

apparatus or equipment for compliance with environmental protection laws and directives. The enactment of the ordinance was limited in its purposes and was not a means to recoup general power supply apparatus or any other costs that CPP deemed appropriate.

## 2. Construction of C.C.O. 523.17 if Unambiguous

{¶ 39} Even if this court were to find that C.C.O. 523.17 is unambiguous, the result would still favor the appellants. Just as we already determined that the consequences of a particular construction would potentially lead to overbroad recovery, it is also presumed that the legislature intended a "just and reasonable result." C.C.O. 101.07(a)(3). "It is an axiom of judicial interpretation that statutes be construed to avoid unreasonable or absurd consequences." *State ex rel. Dispatch Printing v. Wells*, 18 Ohio St.3d 382, 384, 481 N.E.2d 632 (1985); *State ex rel. Cooper v. Savord*, 153 Ohio St. 367, 92 N.E.2d 390 (1950), paragraph one of the syllabus.

{¶ 40} "'The absurd result principle in statutory interpretation provides an exception to the rule that a statue should be interpreted according to its plain meaning.'" (Emphasis deleted.) *State ex rel. Clay v. Cuyahoga Cty. Med. Examiner's Office*, 152 Ohio St.3d 163, 2017-Ohio-8714, 94 N.E.3d 498, ¶ 22, quoting Dougherty, *Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation*, 44 Am.U.Law.Rev. 127 (1994). This exception "'entails the imputation of legislative intent based on the judge's

perception' and 'vastly expands the [c]ourt's authority.'" *Cuyahoga Cty. Med. Examiner's Office* at ¶ 26, quoting Manning, *The Absurdity Doctrine*, 116 Harv.L.Rev. 2387, 2476 (2003). "If strict construction of a statute would result in 'unreasonable or absurd consequences,' a construing court may reject the strict construction doctrine, because courts must presume that the legislature enacted a statute for a 'just and reasonable result.'" *Cuyahoga Cty. Med. Examiner's Office* at ¶ 23, quoting *Columbia Gas Transm. Corp. v. Levin*, 117 Ohio St.3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 35. Accordingly, C.C.O. 523.17 should not be construed in a manner that would lead to an unreasonable result.

{¶ 41} It is undisputed that paragraph (a) allows CPP to assess an EEA for "special apparatus and equipment required for compliance with environmental laws and directives." The parties' disagreement is with the construction of paragraph (b).

{¶ 42} The first sentence of C.C.O. 523.17(b) reads, "The costs for which an adjustment can be incurred shall include but are not limited to * * *." It then lists specific costs and a catchall provision of "other charges in lieu of compliance." The appellants contend that the "costs for which an adjustment can be incurred" phrase modifies the language in paragraph (a), and the specific types of costs listed are a nonexclusive list of examples of "special apparatus and equipment required for compliance with Federal, State, or City environmental protection laws and directives."

{¶ 43} The city maintains that paragraphs (a) and (b) are independent, with paragraph (a) authorizing the adjustment for costs for special apparatus and

equipment required for compliance with governing environmental protection laws and directives, and paragraph (b) authorizing an adjustment for the specific "costs" listed in paragraph (b), which do not need to be related to environmental protection laws and directives. CPP contends that the "costs for which an adjustment can be incurred" phrase is independent from the language in subsection (a), and the specified costs listed are a nonexclusive list of costs for which adjustments are authorized.

{¶ 44} The language in paragraph (b) — "shall include but are not limited to * * * " indicates a nonexclusive list of "costs for which an adjustment can be incurred." *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, ¶ 14, citing *State v. Thompson*, 92 Ohio St.3d 584, 588, 752 N.E.2d 276 (2001), quoting *State v. Lozano*, 90 Ohio St.3d 560, 562, 740 N.E.2d 273 (2001). ("The phrase 'including, but not limited to,' "'indicates that what follows is a nonexhaustive list of examples.'"") "Examples are typically intended to provide *illustrations of a term defined in the statute*, but do not act as limitations on that term." (Emphasis added.) *Colbert* at *id*. The term defined is the *critical phrase* that supports whatever the examples or illustrations signify. *See Moore v. Lorain Metro. Hous. Auth.*, 121 Ohio St.3d 455, 2009-Ohio-1250, 905 N.E.2d 606, ¶ 24; *Mathews v. Waverly*, 4th Dist. Pike No. 08CA787, 2010-Ohio-347, ¶ 31. Therefore, what is the critical phrase?

{¶ 45} Adopting the city's construction and interpretation, the "critical phrase" would be "the costs for which an adjustment can be incurred." This interpretation would lead to an unreasonable result because arguably *any* cost,

without limitation, would qualify for an EEA.  Significantly, the city's own evidence supporting its summary judgment motion does not support its construction.  The record reflects that the city recognizes that a limitation exists on what would qualify for an EEA because it concluded in its Fixed Asset Report that some costs do not qualify as an EEA or as a "power supply apparatus" for such adjustment.  It specifically noted in its report what charges would be included or qualify as "power supply apparatus."  *See* the city's Motion for Summary Judgment, Exhibits A and B to the Affidavit of Richard Barton.  (For example, for costs incurred in 1979, the city noted that "transmission tools" and "distribution tools" do not qualify as an EEA.)

{¶ 46} Additionally, even upon considering only the specified costs listed in C.C.O. 523.17(b), the city's interpretation would authorize CPP to assess an adjustment for "voluntary or involuntary research and development charges" without any limitation or identification of what the research and development entails.  This interpretation would allow an adjustment to be made on customer bills for research and development charges relating to *any* subject matter, including intellectual property, artificial intelligence technology, information technology, or administrative office renovations, which have no direct correlation to the production, purchase, or distribution of electricity to customers.  City council could not have intended such an overbroad application that "any cost" would qualify for an EEA; there must be a limitation or correlation as to what type of costs would qualify for an EEA adjustment.  And as discussed, the Fixed Asset Report

demonstrates the city recognizes such a limitation, thus discounting its own interpretation of C.C.O. 523.17.

{¶ 47} The city's interpretation is even further discounted by the other ordinances in Chapter 523 that allow for additional charges to be assessed on customer bills. If the city is correct in its interpretation that any cost at CPP's discretion could justify an EEA, there would be no need for other ordinances that allow for additional charges to be assessed. For example, C.C.O. 523.12 allows for "Special Charges"; C.C.O. 523.061 authorizes a "Charge for Outdoor Residential Lighting." Additionally, under certain rate schedules, including those that allow for an EEA, additional charges may also be assessed. For example, C.C.O. 523.04, Large Commercial Rate Schedule, authorizes a charge for "special services" and if those services are utilized, the rate is "computed by the Division of Light and Power" and the charges associated with installing, furnishing, and removal "may be charged * * * at the discretion of the Division."

{¶ 48} More importantly, in 1974, when the EEA was enacted, city council also enacted the "Excess Fuel and Power Production Charge," which is now the "Energy Adjustment Charge" (or as previously identified "EAC"), as codified in C.C.O. 523.21. The EAC allows the city to assess an energy charge on top of its base rate in order to account for fluctuations in the cost of purchasing power from generating sources. The language specifically allows "[a]n additional incremental charge in excess for fuel and power production and purchase power costs may be applied to the rates proscribed * * *." C.C.O. 523.21(a). The city's construction of

C.C.O. 523.17 would render the EAC superfluous.  And because the two adjustments and charges were enacted contemporaneously, it is reasonable to conclude that city council intended that both ordinances were necessary.  *See, e.g., State v. Polus*, 145 Ohio St.3d 266, 2016-Ohio-655, 48 N.E.3d 553, ¶ 12 (courts must presume that the legislative body intended every part of the statute to be effective); *State ex rel. Myers v. Spencer Twp. Rural School Dist. Bd. of Edn.*, 95 Ohio St. 367, 373, 116 N.E. 516 (1917). ("No part [of a ordinance] should be treated as superfluous unless that is manifestly required, and the court should avoid that construction which renders a provision meaningless or inoperative."); *see also* C.C.O. 101.07(a)(2).

{¶ 49} Accordingly, the more reasonable interpretation is appellants' view that the "term defined" or "critical phrase" is that which is found in paragraph (a) — "required for compliance with Federal, State or City environmental protection laws." This interpretation would not lead to an unreasonable or absurd result because it places a limitation on what costs justify an EEA on customer bills, and it still gives effect to the other ordinances that also allow for adjustments or charges.

{¶ 50} This conclusion is also important when reviewing the context of the two paragraphs and how adjustments are assessed.  Paragraph (a) states:

> The costs of special apparatus and equipment required for compliance with Federal, State, or City environmental protection laws and directives as have been or may be installed and operated from time to time or on a continuing basis shall be prorated on a [cent]/KW.-hr. basis and assessed against the appropriate rate schedule.  The provisions of this section may be applied to rate schedules described in Sections 523.02 to 523.06 or any other rate schedules as may be later enacted and approved.

**{¶ 51}** Paragraph (a) sets forth how the costs are to be assessed against a rate schedule and which rate schedules are subject to the assessment. Based on the plain language, the word "costs" is not limited to the purchase of "special apparatus and equipment required for compliance," but also include their installations and operation. The section then discusses how the costs are calculated — "prorated" and in what manner they will be assessed — "against the appropriate rate schedule." Additionally, the section dictates that all rate schedules are subject to the assessment, but in a discretionary manner — "may be applied to rate schedules."

**{¶ 52}** Paragraph (b), however, does not identify how the costs are to be assessed against a rate schedule and which rates schedules are subject to the assessment. Paragraph (b) states:

> The costs for which an adjustment can be incurred shall include but are not limited to voluntary or involuntary research and development charges, purchase and installation of emission control equipment for sulphur, nitrogen and particulate emissions, purchase and installation of control equipment for protection of the natural water supply, purchase and installation of power supply apparatus and power from remote resources and any other charges levied on the Division of Light and Power in lieu of precise compliance with statutes and directives.

**{¶ 53}** The city claims that it is entirely within the discretion of CPP as to what qualifies for an adjustment and how it is to be calculated, but yet contends that paragraph (a) permits CPP to assess the adjustment across rate schedules. In fact, according to Ivan Henderson, then director of CPP, it is left to his sole discretion as to what qualifies as an adjustment, the amount to be assessed, in what manner the costs are assessed, and against which rate schedules. *See* Henderson Deposition

July 13, 2016, p. 55-56.  Again, the city's position is that (b) is independent of (a) as to what qualifies for an EEA.  But then the city claims that paragraph (a) allows it to assess adjustments across the rate schedules.  The city relies on paragraph (a)'s wording of "this section" (as opposed to "subsection") as authority that allows the costs in (b) to be assessed across the rate schedules.  The city is correct that the word "section" is used.  However, it must be remembered that when C.C.O. 523.17 was originally enacted, the section was only two paragraphs, and never two separately identified subsections, further evidence that (a) and (b) are to be read dependently.

{¶ 54} The city cannot dissect C.C.O. 523.17 to justify its practices of making these adjustments.  Under the city's construction, C.C.O. 523.17 allows for two different recovery mechanisms and two different means of calculating adjustments — proration under (a) and CPP discretion under (b).  We are unable to reconcile this construction with the ordinances governing the rate schedules in Chapter 523 when reading them in pari materia.

{¶ 55} When reviewing the rate schedules under which an EEA is authorized to be assessed, the ordinances each provide:  "Environmental and Ecological Adjustment.  An environmental and ecological adjustment shall be applied to this rate as set forth and described in Section 523.17."  *See* C.C.O. 523.02-523.047; *see also* C.C.O. 523.048-523.065 ("may be applied").[4]  The language within the rate

___

[4] The language in each of these rate schedules uses the wording "an environmental and ecological adjustment."  This further evidences that the terms are not just a heading.

schedules do not allow for two different calculations or any discretion by CPP in those calculations.

{¶ 56} We compare the EEA to how the rate schedules allow for an EAC adjustment. For example, in C.C.O. 523.02, Residential Rate Schedules, the express language provides for (1) discretion, and (2) calculations:

> Energy Adjustment Charge. In accordance with Section 523.21, an incremental charge or credit for energy may be determined on a monthly basis by the Division of Light and Power. Such incremental charge may be made in addition to the rates established in this section, but in no case shall such charge exceed the amount calculated by using the formula established in Section 523.21.

C.C.O. 523.02(c).

{¶ 57} Additionally, C.C.O. 523.03(c) provides for:

> Special Service. Standby, temporary, special, welding, intermittent or extremely low load factor service is not included in this schedule and shall be subject to special rates based upon cost *as computed by the Division of Light and Power*. Applicants for these services may be charged with the cost of installing and furnishing such services as well as the cost of removal of such services *at the discretion of the Division*.

(Emphasis added.) Accordingly, it is clear that city council knows how to give the CPP discretion in its determination of an assessment. Unlike other ordinances that expressly give CPP discretion to assess adjustments or charges, no such language is found in the rate schedules as it pertains to an EEA or in paragraph (b) of C.C.O. 523.17.[5]

---

[5] In fact, when Ordinance No. 1629-73 establishing Section 1.2518 was first introduced in 1973, it contained the language of such discretion. It provided: "may at the option of the Division of Light and Power, be prorated * * *." Council deleted division's discretion during its enactment of C.C.O. 523.17. The language was passed and currently

{¶ 58} Further support for the correlation between (a) and (b) and our finding the two paragraphs are to be read dependently is the phrasing "compliance with Federal, State, or City environmental protection laws and directives" in paragraph (a). This language mimics the language used in paragraph (b) — "and any other charges levied on the Division of Light and Power in lieu of precise compliance with statutes and directives." This last catchall provision in paragraph (b) demonstrates that council intended to allow adjustments when the city was faced with "other charges" when precise compliance with environmental laws was not feasible.

{¶ 59} Accordingly, whether we find that the ordinance is ambiguous or unambiguous, this court determines that C.C.O. 523.17 does not authorize the city to assess costs against its customers for purchase and installation of power supply apparatus in an overbroad fashion. Rather, the costs assessed for the purchase and installation of power supply apparatus must correlate to those "for compliance with Federal, State or City environmental and protection laws." The nonexclusive list of examples of those costs are found in paragraph (b). The "costs" listed in (b) are not independent of the "costs" listed in paragraph (a), but rather dependent. Accordingly, the trial court erred its interpretation of C.C.O. 523.17.

{¶ 60} It is undisputed that all EEA amounts charged by the city were not for the "costs of special apparatus and equipment required for compliance with

reads "shall be prorated on a cents/K.W.-hr. basis and assessed against the appropriate rate schedule."

environmental protection laws and directives," but were for the general "purchase and installation of power supply apparatus." In fact, the city agrees that the costs assessed were not for any environmental purposes. Accordingly, the adjustments made by the city were not authorized under C.C.O. 523.17. However, our determination does not necessarily lead to the conclusion that the city breached its electric service agreement with its customers.

{¶ 61} In Ohio, municipal corporations are authorized by the self-executing provisions of Article XVIII, Sections 4 and 6 of the Ohio Constitution to establish, maintain, and operate municipal lighting, power, and heating plants for the generation, transmission, and supplying of electricity to the municipal corporation and the inhabitants thereof, and the "'General Assembly is without authority to impose restrictions or limitations upon that power.'" *Orr Felt v. Piqua*, 2 Ohio St.3d 166, 170, 443 N.E.2d 521 (1983), quoting *Swank v. Shiloh*, 166 Ohio St. 415, 143 N.E.2d 586 (1957), paragraph one of the syllabus.

{¶ 62} "When a municipal corporation chooses to operate a public utility pursuant to a constitutional grant of authority, it functions in a proprietary capacity and is entitled to a 'reasonable profit.'" *Niles v. Union Ice Corp.*, 133 Ohio St. 169, 181, 12 N.E.2d 483 (1938). "The only restraint imposed by law upon a municipality's proprietary undertaking of providing electrical energy is 'that the rates charged be reasonable and that there be no unjust discrimination among the customers served, taking into account their situation and classification.'" *Orr Felt* at 170-171, quoting *State ex rel. Mt. Sinai Hosp. v. Hickey*, 137 Ohio St. 474, 477, 30 N.E.2d 802 (1940).

{¶ 63} In *Orr Felt*, the Ohio Supreme Court reviewed a class action lawsuit brought by electric utility customers alleging that the city of Piqua adjusted rates arbitrarily, without relation to the applicable ordinance, and in excess of that authorized by law. Piqua's ordinances established different base rates for varying classes of residential and commercial customers, and included a fuel adjustment clause. The fuel adjustment ordinance was amended from time to time, but always set forth a detailed formula for calculating the adjustment. The trial court found that the city did not comply with the formula and had included costs of purchased electric power rather than generated electric power in its calculations of the adjustment.

{¶ 64} The court of appeals reversed. In their decision, which the Ohio Supreme Court cited with approval, the appellate court acknowledged that this was not in strict compliance with the ordinance but nevertheless found in favor of the city. The appellate court concluded:

> the adjustment permitted is not a charge, in and of itself, but merely the result of a formula applied * * * to increase or decrease the billing under an associated base rate ordinance * * * for the kilowatt hours of power used by the customer. Each complements the other and together they produce the net charge and net billing to the customer. It is the amount involved in that net charge and billing which determines whether there has been an overcharge to the customer.

*The Orr Felt Co. v. Piqua*, 2d Dist. Miami No. 80 CA 63, 1981 Ohio App. LEXIS 13097, 36 (Oct. 8, 1981).

{¶ 65} The Ohio Supreme court upheld the billed charges as proper and within the city's authority, despite the lack of strict compliance with the ordinance.

The Court particularly found "no Ohio authority to support the proposition that a municipality must conform to a symmetry between the components of base rates and adjustment clauses. Rate making is * * * an inexact science. The critical focus in an examination of the reasonableness of a rate ordinance is the *totality of the ordinance*, not isolated factors such as a fuel adjustment clause, which clause a municipality is not required to adopt." (Emphasis added.) *Orr Felt*, 2 Ohio St.3d at 171, 443 N.E.2d 521. The court concluded that the appellant class had failed to carry its burden of demonstrating "that the aggregate revenues collected under the base rates and adjustment clauses exceeded that permitted by both the base rate and fuel ordinances." *Id.*

{¶ 66} In this case, construing the evidence in a light most favorable to appellants, we find that genuine issues of material fact exist pertaining to the reasonableness of the rates and adjustment charges, and whether the aggregate revenues collected exceed that permitted by both the base rates and the adjustment ordinances.

{¶ 67} Unlike in *Orr Felt*, where the permitted adjustment was not a "charge" but a result of an applied formula, the EEA is a charge that the city admits is determined, calculated, and assessed in a discretionary fashion. *See* Henderson Deposition July 13, 2016, p. 55-56. Unlike in *Orr Felt*, there is no formula that the city utilizes in making an EEA to customer bills. Rather, the adjustment discussed in *Orr Felt* is more akin to an EAC that the city applies to customer bills because it is the result of a legislative formula and complements the base rates charged.

{¶ 68} We already determined that CPP was not authorized under C.C.O. 523.17 to make any EEA on customer bills for the purchase and installation of general power supply apparatus. Nevertheless, the city maintains that the aggregate revenues collected under the base rates and adjustment clauses do not exceed what would be permitted under the totality of the ordinances because the rates charged were reasonable, and there was no unjust discrimination among the customers served taking into account their situation and classification.

{¶ 69} The city maintains there is no question of fact that its aggregate revenues were reasonable because (1) the city has kept its rates competitive with rates charged by FirstEnergy/Cleveland Electric Illuminating Company; (2) all EEAs were for the purchase and installation of power supply apparatus allowable under C.C.O. 523.17; (3) from 1984 to the present, the city has never utilized C.C.O. 523.17 to adjust customers' rates to recover costs of any specific capital asset or expense; and (4) the city has not increased base rates despite its growth in its customer base by 30,000 and increased value of assets by over $400 million.

{¶ 70} Appellants contend that the aggregate revenues were unreasonable because CPP was not authorized to assess an EEA to recoup general power supply apparatus that were already recouped through its base-rate charge. According to appellants, the assessment of charges unrecoverable under C.C.O. 523.17 constitutes a breach of the agreement between customers and the city.

{¶ 71} The disagreement between the parties is whether the city through its base rates already recouped the general power supply apparatus costs. Catherine

Troy, City Fiscal Administrator, and Frank Badalamenti, Director of Public Utilities Financial Officer, had concerns about the use of the EEA and could not reconcile the adjustments with any actual charges CPP had incurred as authorized under the ordinance. *See* Catherine Troy Deposition, dated March 22, 2017, p. 48, 50, 56-57. Additionally, Frank Badalamenti testified that it would be unreasonable to bill a customer for a charge that could not be reconciled that had not been accurately tracked, recorded, documented, or already recovered through base rates. *See* Badalamenti Deposition, dated March 7, 2017, p. 223-225.

{¶ 72} Plaintiff's expert, Michael Gorman, testified at deposition that the costs assessed by an EEA were recovered within the base rates and the EAC. *See* Gorman Deposition, November 28, 2017, p. 173-174. Gorman additionally stated that after the city ceased assessing the EEA in 2014, it had no negative impact on CPP's operations. *Id.* at p. 191.

{¶ 73} However, Sharon Dumas, the city's Director of Finance, averred that without the benefit of the EEA, CPP would have had a negative unrestricted cash balance, absent significant changes to CPP's operations. *See* Dumas Affidavit dated January 1, 2018. In essence, the city relied on its collection of an EEA to pay its bills. *Id.* The city argues that it is implausible to believe that its over 30-year unchanged base rate allows for double recovery of power supply apparatus because double recovery would yield a surplus of funds.

{¶ 74} However, prior to the enactment of now C.C.O. 523.17, no other ordinance authorized the city to assess an adjustment to a customer's bills for the

"purchase and installation of power supply apparatus," even though prior to the enactment, CPP was still generating electricity as well as distributing it to its customers. Accordingly, it is unclear under what mechanism the city was able to recover its expenses for general power supply apparatus prior to 1974. The city did not utilize an C.C.O. 523.17 until 1984, which is when the city started adjusting customer bills for an EEA.

{¶ 75} The city could have sought city council approval to increase its base rates to account for the increased costs associated with distributing electric power to its customers over the past 30 years, including those costs associated with its general power supply apparatus. And possibly, the amounts assessed as an EEA to its customers may very well be the same had the base rates been increased. But under the facts and evidence before this court, these are genuine issues of material fact that this court cannot reconcile.

{¶ 76} Accordingly, viewing the evidence in the light most favorable to the nonmoving party, there is a material question of fact whether the aggregate revenues collected under the base rates and the authorized adjustment charges exceeded that permitted by both the base rates and the other ordinances. If it did, the assessment and collection of the EEA would be unreasonable under the totality of the ordinances and may constitute a breach of contract.

{¶ 77} The trial court erred in granting summary judgment in favor of the city on appellants' breach of contract claim. Because this claim survives summary judgment, we offer no opinion on appellants' assertion that the city also breached its

contract because (1) the EEA was not separately identified on billings; or (2) any EEA was not prorated.

## B. Declaratory Judgment, Injunction, and other Equitable Relief

{¶ 78} Appellants also brought causes of action for a declaratory judgment, injunction, and other equitable relief. Appellants sought a declaration that the city's bills were improperly calculated because they included improper EEAs, or they were based on unaccounted for costs fabricated by the city; they requested that all accounts be recalculated. They also sought an injunction to prevent the city from billing for an EEA without disclosing those amounts and from collecting any other EEA amounts that have not been collected according to the city's accounting. Finally, appellants sought equitable relief of restitution and recalculation based on unjust enrichment claims.

{¶ 79} Based on our interpretation of the ordinance and our conclusion that genuine issues of material fact exist whether the city breached its contract with its customers, appellants' other causes of action also survive. Appellants' claims for restitution, unjust enrichment, and declaratory relief are based upon the same facts as those supporting their claim for breach of contract. Therefore, until the questions of fact are resolved with respect to the breach-of-contract action, there also exists a dispute of material fact as to appellants' other causes of action. Accordingly, the trial court erred in granting summary judgment in favor of the city on appellants' claims for declaratory relief, injunction, unjust enrichment, and restitution.

## C. Fraud

**{¶ 80}** Appellants also brought a fraud claim alleging that the city improperly charged and unlawfully calculated the EEA. Specifically, they contend that the city intentionally concealed that the EEA was not based on actual costs allowable under C.C.O. 523.17 but assessed them in a unilateral discretionary manner determined by CPP's commissioner, and that the adjustments were unreasonably made. They allege the city knew the billings were false because it manufactured retrospective budgets for costs and characterized the costs as allowable EEA, although in actuality they were not for the purposes stated in C.C.O. 523.17.

**{¶ 81}** The city moved for summary judgment against appellants, contending that it is immune to a fraud cause of action pursuant to R.C. 2744.01. Notwithstanding this argument, the city argued further that appellants' claims for both fraud and breach of contract are based on the same actions. Finally, the city claimed it was entitled to judgment as a matter of law because appellants could not produce any evidence satisfying the requisite elements of fraud because there is no evidence of any affirmative misstatement or concealment where there was a duty to disclose under the law.

**{¶ 82}** The appellants contend that the city's fraud defenses were already considered and rejected by the trial court when it denied the city's motion to dismiss under the same grounds. While this may be true, a motion to dismiss and a request for summary judgment are two different vehicles. In a motion to dismiss, the trial court is restricted to the pleadings, whereas in a summary judgment, the court can

consider other materials pursuant to Civ.R. 56. Accordingly, we find no merit to appellants' argument.

{¶ 83} Pursuant to R.C. 2744.01, the city is entitled to immunity on the appellants' fraud cause of action because Ohio's Political Subdivision Tort Liability Act, codified at R.C. Chapter 2744, bars intentional tort claims of fraud against municipalities. R.C. 2744.02(A)(1) establishes the general rule of immunity granted to municipalities and provides in relevant part:

> Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.

{¶ 84} The city is a municipal corporation and a political subdivision as defined by R.C. 2744.01(F). While there are five exceptions to this immunity, appellants have failed to present any evidence establishing a genuine issue of material fact regarding any of those exceptions.

{¶ 85} In their complaint, appellants alleged that the city was not entitled to immunity pursuant to R.C. 2744.02(B)(2), the exception that addresses negligent performance of acts of employees regarding proprietary functions of political subdivisions. Even if appellants presented evidence to create a genuine issue of fact that the city or any of its employees acted negligently, the exception for negligent acts does not apply to intentional torts such as fraud. *See Hubbard v. Canton City School Bd. of Edn.*, 97 Ohio St.3d 451, 2002-Ohio-6718, 780 N.E.2d 543, ¶ 8 ("There

are no exceptions to immunity for the intentional torts of fraud and intentional infliction of emotional distress.").

{¶ 86} In *Rid-All Exterminating Corp. v. Cuyahoga Metro. Hous. Auth.*, 8th Dist. Cuyahoga No. 98174, 2012-Ohio-5074, ¶ 9, this court addressed tort claims, including fraud, brought on allegations that the public defendant had breached its contract with the plaintiff.  In reversing the trial court's denial of the defendant's motion to dismiss, we explained:

> The court erred by denying CMHA's motion to dismiss the fraud claim because "there are no exceptions to immunity for the intentional tort of fraud * * *."  *Wilson v. Stark Cty. Dept. of Human Servs.*, 70 Ohio St.3d 450, 452, 639 N.E.2d 105 (1994); *see also Charles Gruenspan Co., LPA v. Thompson*, 8th Dist. [Cuyahoga] No. 80748, 2003[-]Ohio[-]3641, ¶ 48: ("As a general rule, political subdivisions are not liable in damages unless a specific exception to that immunity exists. This applies particularly to intentional tort claims of fraud and intentional infliction of emotional distress.")

{¶ 87} Accordingly, because appellants presented no evidence that their fraud claims fall within any of the five exceptions specified in R.C. 2744.02(B) the city is entitled to immunity on this claim.  We find that the trial court did not err in granting summary judgment in favor of the city on the appellants' claim for fraud.

{¶ 88} Based on the foregoing, appellants' first assignment of error is sustained in part, and overruled in part.

### III.  Statute of Limitations — Goods vs. Service

{¶ 89} Appellants contend in their second assignment of error that the trial court erred in applying the statute of limitations for the sale of goods to the contract claim regarding adjustments to customers' electric bills.  They contend that in the

context of their breach-of-contract action, the action is on the city's billing practices, not the actual sale of electricity. Accordingly, appellants maintain electricity in this sense is a service.

{¶ 90} Despite granting summary judgment in favor of the city, the trial court also considered what statute of limitations applied to appellants' breach of contract claim. Because we find that the trial court partially erred in granting summary judgment, causing a majority of appellants' claims to survive, we will address the statute-of-limitations issue.

{¶ 91} The city maintains that if the claims survive, appellants' claims for damages can extend no further than four years prior to the filing of the complaint pursuant to R.C. 1302.98, which governs the applicable statute-of-limitations period for a breach of contract for a sale of goods. Appellants maintain that the applicable statute of limitations on their breach of contract claim is governed by R.C. 2305.06, because providing electricity is a service. The trial court agreed with the city and found that the relevant statute-of-limitations period on appellants' breach-of-contract claim is one for the sale of goods. We disagree.

{¶ 92} The parties' differing positions about whether electricity is a good or a service is a common debate that has sparked much discussion, and no uniformity on this question exists among the states. *See Otte v. Dayton Power & Light Co.*, 37 Ohio St.3d 33, 523 N.E.2d 835 (1988); *In re Escalera Resources Co.*, 563 B.R. 336 (Bankr.D.Colo.2017) (extensive state and federal law review deciphering electricity as a good or service for purposes of bankruptcy proceedings).

{¶ 93} The city relies on a 1986 trial court decision from Hamilton County to support its position that electricity is a good. *See Cincinnati Gas & Elec. Co. v. Goebel*, 28 Ohio Misc.2d 4, 502 N.E.2d 713 (M.C.1986). The *Goebel* court considered whether in the context of the Ohio Uniform Commercial Code, the sale of electricity to a utility's customer constitutes a sale of goods. The court concluded that once electricity is metered as it enters a home, it is deemed to be a good under the U.C.C., thus distinguishing electricity from its raw state. *Id.* at 715.

{¶ 94} According to the city, because appellants' breach of contract claim centers on the sale of electricity and how customers are charged, *Goebel* is controlling, and electricity should be viewed as a good and subject to a four-year statute of limitations pursuant to R.C. 1302.98.

{¶ 95} The appellants rely on the Ohio Supreme Court's decision in *Otte*, 37 Ohio St.3d 33, 523 N.E.2d 835, that electricity, for strict products liability purposes, is a service, not a good. In *Otte*, the court reasoned that "[a] 'product' is anything made by human industry or art. Electricity appears to fall outside of this definition * * * because electricity is the flow of electrically charged particles along a conductor." *Id.* at 36. The court held that the defendant did "not manufacture electrically charged particles, but rather, sets in motion the necessary elements that allow the flow of electricity." *Id.* Accordingly, the court found that there was a defect in the "distribution system. Such a system is, in our view, a service." *Id.*

{¶ 96} Although the opinion in *Goebel* was available for the Supreme Court to consider and discuss, the court made no reference to the *Goebel* holding that

metered electricity was a good. The disagreement between whether electricity is a good or a service, however, did not go unnoticed to the Supreme Court. In fact, the court determined that making the distinction is an "intellectual disaster." *Otte* at 36.

{¶ 97} In fact, the *Otte* court discussed the same reasoning relied upon by *Goebel* — that once the electrical energy travels through the meter, it becomes a good. The *Otte* court stated:

> We must note that there are a scattering of cases that have determined electricity is a product for strict liability purposes. Some have reached the curious conclusion that electricity passing through a consumer's meter becomes a product, but electricity not passing that point is a service. Although this distinction is convenient for Section 401A analysis purposes, we find it unsupported by both logic and common law.

*Otte* at 37-38.

{¶ 98} The city contends that *Otte,* 37 Ohio St.3d 33, 523 N.E.2d 835, is distinguishable because the court was addressing solely the issue of whether strict liability in tort applied to a public utility, not the question of whether electricity was a good or service in a breach of contract context. In support, the city directs us to the *Otte* court's posited question "whether electricity is a product within the context of the facts before us." *Id.* at 36. Additionally, the city maintains that the court limited its holding by stating, "we find electricity is a service, not a product, in the generally accepted sense of the word under the factual context of this case." *Id.* at 37.

{¶ 99} The city contends that *Otte* does not stand for the proposition that electricity, whether in raw or metered form, constitutes a service, but only that it is not a "product" for purposes of strict liability. We note, however, that subsequent to this decision, the Ohio Supreme Court confirmed that in *Otte* it "determined that electricity supplied by a public utility is a service and not a product." *Jackson v. Alert Fire & Safety Equip., Inc.*, 58 Ohio St.3d 48, 55, 567 N.E.2d 1027 (1990). "A 'product' is 'anything made by human industry or art,' whereas electricity is a 'service' because it does not require a manufacturing process." *Id.*, quoting *Otte* at 36. Granted, the cause of action in *Jackson* was also a strict products liability action; we note, however, that the court did not qualify or limit its determination in making this statement. Accordingly, we find the reasoning in *Otte* persuasive and conclude that the Ohio Supreme Court's determination that electricity is a service would also be applied in the case before this court.

{¶ 100} The *Otte* court discussed consumer usage of electricity and determined that:

> Consumers, moreover, do not pay for individual electrically charged particles. Rather, they pay for each kilowatt hour provided. Thus, consumers are charged for the length of time electricity flows through their electrical systems. They are not paying for individual products but for the privilege of using [the electric company's] service.

*Otte* at 37.

{¶ 101} Applying *Otte*, we find that electricity in the context of this case is a service. Accordingly, we find that the trial court erred in characterizing electricity as a "good" and subject to a four-year statute of limitations pursuant to R.C. 1302.98.

{¶ 102} Finding that electricity is a service and not subject to the limitations period set forth in R.C. 1302.98, we must now determine the relevant statute-of-limitations period.

{¶ 103} Appellants maintain that the relevant statute of limitations is one for written contracts. R.C. 2305.06 applies to contracts in writing and currently provides that "an action upon a specialty or an agreement, contract, or promise in writing shall be brought within eight years after the cause of action accrued."[6]

{¶ 104} The city argues in the alternative that the six-year statute of limitations established by R.C. 2305.07 should be applicable, not the longer statute of limitations under R.C. 2305.06 as asserted by appellants.

{¶ 105} R.C. 2305.07 provides that

> Except as provided in sections 126.301 and 1302.98 of the Rev. Code, an action upon a contract not in writing, express or implied, or upon a liability created by statute other than a forfeiture or penalty, shall be brought within six years after the cause thereof accrued.

{¶ 106} The city maintains that because the relationship between it and appellants is premised upon Chapter 523 of the Cleveland Codified Ordinances, the

---

[6] The editor's note provides "Acts 2012, SB 224 [Section] 3 provides: 'Section 4. For causes of action that are governed by Section 2305.06 * * * and accrued prior to the effective day of this act, the period of limitations shall be eight years from the effective date of this act or the expiration of the period of limitations in effect prior to the effective day of this act, whichever occurs first.'"

The statute of limitations for civil actions based on written contracts is currently eight years. R.C. 2305.06. For claims that accrued prior to September 28, 2012, the statute of limitations is the lesser of 15 years from the date of accrual or 8 years from September 28, 2012, the effective date of the amendment. 2012 Am.Sub.S.B. No. 224, Section 4.

alleged resulting liability is "created by statute," and the six-year period of limitations established by R.C. 2305.07 governs the breach-of-contract claim. In support, it cites to this court's decision in *Moran v. Cleveland*, 58 Ohio App.3d 9, 567 N.E.2d 1317 (8th Dist.1989), wherein we held that "the 15-year statute of limitations for breach of written contracts does not apply to collective bargaining agreements; rather, the 6-year statute of limitations set for in R.C. 2305.07 for a liability created by statute applies" because the claim is one for a violation of the National Labor Relations Act. The contract statute of limitations is inapplicable in this context because "[t]he relationship between the [worker] and the Union does not arise out of a contract between the two but rather out of the role of the Union under the labor relations statutes as representative[s] of [the worker] before the employer." *Newton v. Local 801 Frigidaire Local of Internatl. Union of Elec. Workers*, 684 F.2d 401, 403 (6th Cir.1982).

{¶ 107} The city's position that the parties' relationship is "created by statute" is contrary to its position during summary judgment that "the relationship between CPP and its customers is contractual, under [C.C.O. 523.19(a)]. * * * CCO 523.19(a) establishes that, by operation of law, the relationship between CPP and each of its customers is a contractual relationship." *See* the city's Motion for Summary Judgment, p. 5; *see also* p. 6 ("because the relationship between CPP and each of its customers arises from a written contract by operation and as a matter of law, any claims by any consumer against CPP relating to CPP's supply and sale of electrical power to the customer must be controlled by Ohio contract law.").

{¶ 108} In this case, the city and appellants have a contractual relationship. The claims in this action are not governed by a collective bargaining agreement or a state or federal law that creates liability for the city as was the case in *Moran*. The liability was not created by C.C.O. 523.17; rather, the written contract is created by ordinance to which the parties agree to be bound. Appellants have ordinary contract claims because it is alleged that the city breached the agreement by making adjustments that were not allowed by the express terms of the agreement and by not separately identifying those adjustments on customer bills. Accordingly, the applicable statute of limitations established in R.C. 2305.06 applies.

{¶ 109} The appellants' second assignment of error is sustained.

{¶ 110} Judgment affirmed in part, reversed in part, and remanded.

It is ordered that parties share equally the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

KATHLEEN ANN KEOUGH, JUDGE

MARY EILEEN KILBANE, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR